Scott-Nickels Bus Company, a corporation v. Commissioner. Joseph E. Johnson v. Commissioner. Estate of Henry Nickels, Deceased, Catherine Nickels, Executrix v. Commissioner.
Scott-Nickels Bus Co. v. Commissioner
Docket Nos. 40399-40401.
United States Tax Court
T.C. Memo 1956-120; 1956 Tax Ct. Memo LEXIS 174; 15 T.C.M. (CCH) 606; T.C.M. (RIA) 56120; May 18, 1956
Charles W. Moxley, Esq., 1601 Kanawha Valley Building, Charleston, W. Va., and W. M. Drennen, Esq., for the petitioners. R. G. de Quevedo, Esq., and Lyman G. Friedman, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined deficiencies in tax of the petitioners *175 and additions to tax under sections 293(b) and 291 of the Internal Revenue Code of 1939 as follows for the indicated years: Additions to Tax
Petitioner
Dkt. No.
Year
Tax
Deficiency
Sec. 293(b)
Sec. 291
Scott-Nickels Bus Com-
pany
40399
1940
Income
$ 7,362.35
$ 4,029.88
Declared value
excess profits
4,420.02
2,318.34
Excess profits
5,590.36
2,844.68
1941
Income
5,040.98
2,520.49
Declared value
excess profits
4,394.38
2,197.19
Excess profits
10,690.65
5,345.33
$2,672.66
1942
Declared value
excess profits
$ 4,567.72
$ 2,526.41
Excess profits
26,321.55
19,004.23
1943
Declared value
excess profits
8,873.62
4,436.81
Excess profits
102,291.19
51,145.60
1944
Declared value
excess profits
6,905.41
3,452.70
Excess profits
80,475.44
40,237.72
1945
Declared value
excess profits
2,829.95
1,414.98
Excess profits
35,782.68
17,891.34
1946
Income
20,014.61
10,007.31
1947
Income
12,155.87
6,077.94
Joseph E. Johnson
40400
1940
Income
$ 2,135.20
$ 1,067.60
1941
Income
2,286.06
2,720.86
1942
Income
11,077.01
5,928.91
1943
Income and
victory
36,282.38
18,141.19
1944
Income
46,175.15
23,131.71
1945
Income
16,349.15
8,174.58
1946
Income
18,051.69
9,025.85
1947
Income
27,845.34
13,922.67
Estate of Henry Nickels,
Deceased
40401
1940
Income
$ 1,341.76
$ 670.88
1941
Income
5,463.64
2,731.82
1942
Income
6,014.06
3,007.03
1943
Income and
victory
33,794.47
16,897.24
1944
Income
16,322.62
8,161.31
1945
Income
22,317.18
11,392.22
1946
Income
5,444.86
2,722.43
1947
Income
1,107.33
553.67
*176 By amendments to his answers in the proceedings of Joseph E. Johnson, Docket No. 40400, and the Estate of Henry Hickels, Deceased, Docket No. 40401, the respondent has made claim for additions to tax under section 294(d) of the Internal Revenue Code of 1939 for substantial underestimation of tax for the years 1943 through 1947. Issues presented in the proceeding of Scott-Nickels Bus Company and not disposed of by stipulation of the parties are the correctness of respondent's action (1) in determining that for the years 1940 through 1947 the petitioner had certain gross receipts which were diverted by two of its stockholders, Joseph E. Johnson and Henry Nickels, and not reported by petitioner in its income tax returns for such years, (2) in disallowing a deduction of $5,375 for 1940 as a loss sustained by petitioner on the sale of equipment, (3) in determining that petitioner realized a gain of $965.06 in 1941 on the sale of equipment, (4) in disallowing a deduction of $5,500 for 1945 as a loss sustained on the sale of fixtures, (5) in determining that the petitioner is liable for additions to tax for fraud under section 293(b) of the Code for the years 1940 through 1947, (6) in *177 failing to determine that the period of limitations for assessment of tax for the years 1940, 1941 and 1942 has expired, and (7) in determining that for 1941 the petitioner is liable for an addition to excess profits tax for delinquency under section 291 of the Code. Issues presented in the proceeding of Joseph E. Johnson and not disposed of by stipulation of the parties are whether the respondent erred: (1) in determining that petitioner's income for the years 1940 through 1947 was to be determined on the basis of increases in petitioner's net worth plus nondeductible expenditures for the respective years, (2) in determining the amounts of increases in petitioner's net worth for the years 1940 through 1947, respectively, (3) in determining the amounts to be added to the increases in petitioner's net worth for the years 1940 through 1945, and 1947, on account of gambling losses, (4) in determining the amounts to be added to the increases in petitioner's net worth for the years 1940 through 1947 on account of personal living expenses, (5) in determining the amounts to be added to the increases in petitioner's net worth for the years 1941, 1942 and 1944 through 1946 on account of payments *178 made by check which were not verifiable as personal expenses or business expenses, (6) in determining that for the years 1940 through 1947 the petitioner was liable for additions to tax for fraud under section 293(b) of the Code, (7) in determining that the period of limitations for assessment of tax for 1940 and 1941 has not expired, and (8) in asking for a determination that for the years 1943 through 1947 the petitioner was liable for additions to tax under section 294(d) of the Code because of substantial underestimation of tax. Issues presented in the proceeding of the Estate of Henry Nickels, Deceased, and not disposed of by stipulation of the parties are whether the respondent erred: (1) in determining that the income of Henry Nickels for the years 1940 through 1947 was to be determined on the basis of increases in his net worth plus nondeductible expenditures for the respective years, (2) in determining the amounts of increases in the net worth of Henry Nickels for the years 1940 through 1947, respectively, (3) in determining the amounts to be added to the increases in net worth for the years 1940 through 1947 on account of personal living expenses, (4) in determining the *179 income to be apportioned to Catherine Nickels for the years 1941 through 1947, (5) in determining that for the years 1940 through 1947 Henry Nickels was liable for additions to tax for fraud under section 293(b) of the Code, (6) in determining that the period of limitations for assessment of tax for 1940 and 1941 has not expired, and (7) in asking for a determination that for the years 1943 through 1947 Henry Nickels was liable for additions to tax under section 294(d) of the Code because of substantial underestimation of tax. General Findings of Fact Some of the facts in each of the proceedings involved herein have been stipulated and are found accordingly. Petitioner, Scott-Nickels Bus Company, sometimes hereinafter referred to as Scott-Nickels, is a Kentucky corporation organized on February 6, 1940, and has its principal place of business in Williamson, West Virginia. It filed its corporation income tax returns for the years 1940 through 1947, its declared value excess profits tax returns for the years 1940 through 1945, and its corporation excess profits tax returns for the years 1940 and 1942 through 1945 with the collector for the district of West Virginia. It did not *180 file any corporation excess profits tax return for 1941. Petitioner, Joseph E. Johnson, sometimes hereinafter referred to as Dr. Johnson, was a resident of Stone, Kentucky, during the years 1940 through 1947 and is now a resident of South Williamson, Kentucky. For the years 1940 and 1941 he and his wife, Bruce S. Johnson, field joint income tax returns. For the years 1942 through 1947 they filed separate returns. All of the foregoing returns were filed with the collector for the district of Kentucky. Henry Nickels was a resident of Williamson, West Virginia, during the years 1940 through 1947. He and his wife, Catherine Nickels, filed a joint income tax return for 1940 and filed separate returns for 1941 through 1947. All of the foregoing returns were filed with the collector for the district of West Virginia. Henry Nickels died September 19, 1949, and Catherine Nickels, his widow, is the executrix of his estate. Henry and Catherine Nickels grew up on adjoining farms near Nickelsville, Scott County, Virginia. He was one of a family of five children and she is the youngest of a family of nine children. They had known each other well since childhood. About 1921 when Henry was about *181 17 and Catherine was about 15, and while they still were in school, they began going with each other. Henry finished high school in 1924 and Catherine in 1927. After finishing high school Henry left home and went to work in West Virginia and for a time worked in a grocery store there. After finishing high school Catherine also went to work. Henry and Catherine married in April 1929 and one child, a son, was born of their marriage in 1930. At the time of their marriage and for some time prior thereto Henry had been living near Kingsport, Tennessee, where he operated a filling station and did automobile repair work. Following their marriage, Henry and Catherine lived for about three weeks at the home of her brother, G. S. Alley, in Kingsport. They then moved into a small building which was part of the filling station premises. During the latter part of 1929, Henry and Catherine visited her sister, Mrs. M. B. King, and her husband, who lived in Pikeville, Kentucky. During their visit, Henry got a job in Pikeville as mechanic for a bus company which operated a local bus line. He sold his filling station business near Kingsport, and in 1930 he and Catherine went to live with Mrs. King. *182 During the period from then until 1936 they lived most of the time with Mrs. King. During that period Henry's duties with the bus company changed from mechanic to dispatcher. After his duties changed to dispatcher he also drove his Chevrolet automobile as a taxicab as his own operation. About 1934 or 1935 the bus company had financial difficulties and was unable to buy a bus which was necessary for its operations. Henry purchased a Chevrolet chassis, built a bus on it and, under a salary and commission arrangement with the bus company, drove the bus over the company route. In 1936 Henry leased the bus route between Pikeville, Kentucky, and Williamson, West Virginia, which he operated for a year or more and until the sale by the owners of the franchise for the route. Henry conducted this operation under the name of Nickels Bus Line and used a 7-passanger Cadillac automobile for the operation. He did all the driving and all the repair work required in the operation. When Henry began the operation, he moved to Williamson where he and his family lived in a 2-room furnished apartment over the bus terminal until about 1938 when he purchased a residence in Williamson. After the sale *183 by the owners of the franchise for the bus route between Pikeville and Williamson, Henry drove a bus for the Bristol and Norton Bus Line over its route from Pikeville to Bristol, Virginia. During that employment he moved to Bristol where he and his family lived for a few months in a 2-room apartment. During 1938 Henry again leased the bus route between Pikeville and Williamson and operated over it under the name of Scott-Nickels Bus Company. In the conduct of the operation he used the same 7-passenger Cadillac automobile formerly used in operating over the route and acquired another Cadillac which he also used. Aside from the services of one driver, Henry did all the driving and repair work required in the operation. When in 1938 Henry obtained a lease for the bus route between Pikeville and Wililamson, he and his family moved from Bristol to Williamson and occupied the apartment formerly occupied by them over the bus terminal. Thereafter he and his family continued to live in Williamson until his death in 1949. Sometime in 1938 Henry also acquired the franchise for a bus route between Williamson and Chattaroy, West Virginia, which he also operated under the name of Scott-Nickels *184 Bus Company. During 1939 Henry and Dr. Johnson formed a partnership, in which they were equal partners, for the operation of bus lines and conducted business under the name of Scott-Nickels Bus Company. In 1939 the partnership acquired for $4,500 the assets, consisting of franchises and items of bus equipment, of Pond Creek Bus Company, which was owned by Dr. Johnson, N. D. Howard, and John W. Bicker, and which operated a bus line between Williamson and McVeigh, Kentucky. The partnership also acquired for $3,500 the assets, consisting of franchises and items of bus equipment, of Red Jacket Transportation Company. About the time of, or shortly after, the foregoing acquisitions the franchise for the bus line between Williamson and Pikeville was sold by its owners and the partnership had to discontinue operations between those two places. The partnership between Henry and Dr. Johnson continued until the incorporation of the petitioner, Scott-Nickels, on February 6, 1940. Joseph E. Johnson was born in Fazewell, Virginia, and in 1921 graduated from the University of Louisville with the degree of Doctor of Medicine. Upon graduating he began practicing medicine in Harlan, Kentucky, where *185 he remained for about three years. In 1924 he accepted the position of chief medical officer of Fordson Coal Company at Stone, Kentucky, and continued in that employment until sometime prior to 1940 when that company's operations at Stone were acquired by Eastern Coal Corporation. He accepted a like position with Eastern Coal Corporation and continued in its employment until 1945. During the time he was employed by Eastern Coal Corporation he had a substantial private medical practice in addition to his duties with the corporation. Upon leaving the employment of the corporation in 1945, he opened an office in Williamson, West Virginia, where he thereafter through 1947 carried on an extensive medical practice. Dr. Johnson married Bruce S. Johnson in 1924 and thereafter they lived in Stone, Kentucky, until sometime after 1947. They have one child, a daughter, born in 1930. They lived in a house in Stone belonging to the coal company until October 1944 when they moved into an apartment in a building in Stone which Dr. Johnson owned and which formerly had been used as a bank building. Sometime after 1947 they moved from the apartment to South Williamson, West Virginia. During the years *186 1940 through 1947 Dr. Johnson, in addition to his medical employment and medical practice, was an officer in Scott-Nickels and actively participated in the management of Premium Coals, Inc., and Carbon Glow Coal Company of which he was president and in which he was a stockholder. In addition he or Mrs. Johnson also owned interests in mining equipment leased to coal companies and in farm properties in Virginia and Kentucky. Scott-Nickels Bus Company Issue 1. Gross Receipts Diverted by Stockholders Findings of Fact At the time of its organization on February 6, 1940, the authorized capital stock of Scott-Nickels was $10,000 divided into 100 shares of no par value. By an amendment to the charter on July 31, 1940, the authorized capital stock was increased to $50,000 divided into 500 shares of no par value. The capital stock of Scott-Nickels was held as follows from February 1940 through December 31, 1947: Original Issue
Feb. 1940
Aug. 10, 1940
March 1, 1945
to
to
through
Aug. 10, 1940
March 1, 1945
Dec. 31, 1947
Henry Nickels
30 shares
150 shares
150 shares
Catherine Nickels
21 shares
105 shares
100 shares
Joseph E. Johnson
3 shares
101 shares
106 shares
Bruce S. Johnson
46 shares
144 shares
144 shares
Total
100 shares
500 shares
500 shares
*187 The principal officers of Scott-Nickels from February 6, 1940 through December 31, 1947 were as follows: Feb. 6, 1940
March 1, 1943
March 1, 1945
March 1, 1946
to
to
to
through
March 1, 1943
March 1, 1945
March 1, 1946
Dec. 31, 1947
President
Henry Nickels
Henry Nickels
Joseph E.
Henry Nickels
Johnson
Vice-president
Joseph E.
Johnson
1st Vice-president
Joseph E.
Bruce S.
Joseph E.
Johnson
Johnson
Johnson
2d Vice-president
Bruce S.
Henry Nickels
Bruce S.
Johnson
Johnson
Secretary-Treasurer
Catherine
Catherine
Bruce S.
Catherine
Nickels
Nickels
Johnson
Nickels
Scott-Nickels acquired the bus business theretofore conducted by Henry Nickels and Dr. Johnson as partners and the assets employed therein, including franchises, busses and other property, and issued its entire 500 shares of caiptal stock therefor. Following its formation and thereafter through 1947, Scott-Nickels engaged in the business of transporting people by bus from Williamson, West Virginia, to and from various places around Williamson. In addition to operating the Williamson-Chattaroy bus line of a length of 7 miles and *188 the Pond Creek bus line between Williamson and McVeigh, Kentucky, a distance of 13 miles, which has been operated by Henry Nickels and Dr. Johnson as partners, Scott-Nickels, at various times during the period 1940 through 1947, operated additional bus routes between the following places: Williamson and Hardy, Kentucky, a distance of 4 miles; Williamson and Matewan, West Virginia, a distance of 14.8 miles; Williamson and Majestic, West Virginia, a distance of 15 miles; Williamson and Cinderella, West Virginia, a distance of 2 miles. Henry Nickels was general manager of Scott-Nickels during the years 1940 through 1947 except for a period of about a year from March 1945 to March 1946 when he was in ill health. During that one-year period the company was managed by Henry Nickels' brother, Ernest, who prior thereto had been in charge of the company's garage and bus maintenance work. Catherine Nickels was active in the affairs of the company from its inception except for the one-year period mentioned above. Dr. Johnson did not participate in the operating affairs of the company. However, he took an active part in establishing company policies, in labor disputes, and in the company's dealings *189 with the Public Service Commission of Kentucky. He made physical examinations of the company's employees and rendered medical services to them. Bruce S. Johnson looked after the company's advertising. In its operations Scott-Nickels used 21-passenger and 27-passenger busses. The busses were equipped with fare boxes. The fare box collections on busses consisted mostly of nickels and dimes with a few quarters and half dollars and an occasional dollar. The daily collections in the fare boxes on busses used on the shorter routes averaged about $6. Seldom did the daily fare box collections on busses on the long routes exceed $30. Scott-Nickels' only sources of income during 1940 through 1947 were from its receipts from passengers' cash fares, from coin operated lockers and toilets in its bus terminal, card advertising in the busses, the transportation of express carried on busses, the sale of books of bus tickets and a small amount of receipts from a connecting carrier which sold through tickets that included travel over a part of Scott-Nickels' bus routes. When a bus driver was first employed, he was given a change box and a check for $25 which he converted into change. The $25 was *190 charged to him and he kept it until he left the employ of the company. If the driver ran short of change, he would exchange currency he had with the dispatcher at the company's terminal in Williamson for more change. The company had two dispatchers, and they worked on different shifts. Each dispatcher was furnished with a change box for a fixed amount of money, mostly in coin, with which he was charged. The amount varied over the years in question but was increased in later years to $250. As a dispatcher went on duty he received his change box with the fixed amount of change in it and when he went off duty his change box was returned to the company's office where the currency was removed and replaced by change for the dispatcher's next period of duty. If a dispatcher's change box when returned to the office contained less than the amount charged to him, he was required to make good the deficit. The general procedure followed by Scott-Nickels in handling its cash was for one of its principal employees to empty the contends of each fare box once each day. This was usually done at or near the end of the day but in some instances was not done until the following morning. When the money *191 was removed from the fare boxes, it was counted as was any money or checks received from sources other than cash fares. Then a bank deposit slip was made in duplicate on which was recorded the amount of currency and coin taken in, and checks received, if any. A cash receipts slip was also prepared showing the receipts from the various bus routes. The original deposit slip was placed with the money in a canvas bag and put in the company's safe. Thereafter the money with original deposit slip was taken to the bank and deposited. The duplicate deposit slip and the cash receipts slip were turned over to the bookkeeper who recorded on the books of the company as receipts the amounts shown thereon. With the exception of the period from March 1945 to March 1946, the contents of the fare boxes and other money were usually counted by Henry and Catherine Nickels during the years 1940 through 1947. However, on various occasions other employees of the company counted the money and made out the deposit and cash receipts slips. From March 1945 to March 1946, Ernest Nickels counted the money and made out the various slips. Neither Dr. Johnson nor Mrs. Johnson had anything to do with the counting *192 or handling of the money or other receipts taken in by the company. In its income tax returns for 1940 through 1947, Scott-Nickels reported the following amounts as gross receipts: 1940
$ 76,773.46
1941
91,423.17
1942
137,382.35
1943
181,417.07
1944
196,846.84
1945
228,634.14
1946
206,912.21
1947
281,365.00
In determining the deficiencies in the case of Scott-Nickels for the years 1940 through 1947, the respondent determined that additional gross receipts by the company for the respective years were diverted as follows by Henry Nickels and Dr. Johnson and were not reported as income by the company: Amount
Total
Diverted
Amount
Amount
by Henry
Diverted by
Diverted
Nickels
Dr. Johnson
1940
$ 29,196.75
$ 14,419.00
$ 14,777.75
1941
32,413.06
24,403.56
8,009.50
1942
30,862.28
16,704.46
14,157.82
1943
99,383.56
49,631.93
49,751.63
1944
85,229.16
32,332.13
52,897.03
1945
38,235.85
19,943.92
18,291.93
1946
47,366.93
11,049.67
36,317.26
1947
33,246.05
33,246.05
Total
$395,933.64
$168,484.67
$227,448.97
Opinion The respondent did not set out in the notice of deficiency the basis *193 on which he determined that the gross receipts of Scott-Nickels had been diverted by Henry Nickels and Dr. Johnson as set out in our findings of fact. However, in his opening statement at the hearing, counsel for the respondent stated that the determination was made on the following basis: The respondent determined the net incomes of Henry Nickels and Dr. Johnson for the years in controversy on the basis of increases in net worth plus nondeductible expenditures; that on the basis of such determination the respondent concluded that those individuals had greatly understated their net incomes for the respective years; that since the respondent concluded that a portion of such understatements of income was derived from certain ascertained sources of income of those individuals and since the respondent "couldn't tie down" the remaining portion to any particular source, he concluded that such portion represented gross receipts of Scott-Nickels which those individuals had diverted to themselves, which were not recorded on the books of Scott-Nickels, and which were not reported as income by it. The petitioners do not contend that if Scott-Nickels had gross receipts which were diverted as *194 determined by respondent, such receipts would not constitute taxable income to the company. However, they contend that the company did not have any receipts of that character and that the record supports their position. They further contend that the evidence presented shows that the respondent unjustifiably concluded that the income of Henry Nickels and Dr. Johnson, the source of which he was unable to identify, represented diverted gross receipts of Scott-Nickels. They urge that this is especially true in the case of Dr. Johnson who had income from a number of sources other than Scott-Nickels. In addition to submitting the books of Scott-Nickels in evidence and testimony to the effect that the books correctly reflect the company's gross receipts, the petitioners have submitted the testimony of a number of employees of Scott-Nickels during the years in question who had to do with the handling and recording of the cash receipts of the company. These witnesses, including the bookkeepers and the company's auditor who checked its records monthly after 1942, testified that they never saw or found anything which indicated to them, or caused them to suspect, that any receipts of the company *195 were being taken by anyone prior to being recorded on the books of the company. Their testimony also was to the effect that there was nothing furtive, secretive, or questionable in the way in which the receipts were handled. Catherine Nickels who had considerable to do with the counting and handling of the cash receipts over most of the years in question testified that, so far as she knew, Henry Nickels had never diverted any funds of the company and Dr. Johnson testified that he had not diverted any of its funds. The respondent has not offered any evidence directed to the times or manner of any diversions, and the substance of his argument on brief is that possibly Henry Nickels and Dr. Johnson, at night, and without anyone else knowing of it, took from bus fare boxes or from the company's safe receipts which had not been counted and recorded on the books of the company. The respondent urges that the situation presented here is akin to that presented in United Mercantile Agencies, Inc., 23 T.C. 1105; United Dressed Beef Co., 23 T.C. 879; Eugene Vassallo, 23 T.C. 656; and Currier v. United States, 166 Fed. (2d) 346, wherein it *196 was held that corporate income diverted by stockholders was taxable to the corporation. However, recognizing that the situations in those cases are distinguishable from that here, the respondent states such distinction to be that in those cases the amount of corporate income diverted by the stockholders was readily ascertainable while here the corporate receipts were in the form of cash and are hard to trace. The cases cited by respondent are further distinguishable on the ground that there the stockholders had admitted diverting corporate funds or there was evidence affirmatively establishing the fact that the stockholders actually had diverted corporate funds. Neither of those situations is present here. From the evidence presented, we can not find as a fact that Henry Nickels or Dr. Johnson ever diverted any of the gross receipts of the company. Further, from the evidence presented, we fail to see how they could have engaged in a diversion of receipts with the frequency and magnitude indicated by the respondent's determination without at least the bookkeepers and the auditor having become aware of, or suspected, that all receipts were not being recorded. In our opinion, the *197 evidence submitted by the petitioners on this issue is sufficient to overcome the presumption of correctness of the respondent's determination. Since the respondent has not submitted evidence in rebuttal, we are unable to sustain his determination that Scott-Nickels during the years in question had diverted gross receipts which were not recorded on its books and were not reported by it as income. Issue 2. Loss on Sale of Equipment in 1940. Issue 3. Gain on Sale of Equipment in 1941 Consideration of these issues becomes unnecessary since petitioners state on brief that determination of them is not requested in the event decision of Issue 5 as to 1940 and 1941 is favorable to Scott-Nickels and since we are holding below for the company for those years under that issue. Issue 4. Loss on the Sale of Fixtures in 1945 Findings of Fact In September 1943, Henry Nickels and Dr. Johnson acquired from A. J. Bassett the premises known as the Bassett Building situated in Williamson, West Virginia. The building, which consisted of a single story and had frontage on two intersecting streets, was under lease to a tenant who conducted a confectionery therein and used in the business certain *198 fixtures and equipment owned by Bassett. During 1944 it became necessary for Scott-Nickels to acquire larger waiting room facilities for its business. In that year it acquired the lease on the premises and began using about half of the building for waiting room purposes. At or about the same time, Scott-Nickels purchased from Bassett the fixtures and equipment which had been used in the confectionery business and paid him $8,000 for them. Subsequently and in June 1945, it sold the fixtures and equipment to Charles D. Gott for $2,500, represented by notes. Thereupon Gott, using the fixtures and equipment and occupying the portion of the building not used by Scott-Nickels, conducted business as a sole proprietor under the name of Terminal Grill. Having been unable to pay the rent, keep the business operating and make any payments on the notes which he had given for the fixtures and equipment, Gott discontinued the business in 1946, and Henry Nickels and Dr. Johnson took over, in equal shares, the furniture and equipment from him. Since Gott had paid nothing on the notes, Henry Nickels and Dr. Johnson each in 1946 assumed payment of one-half of the amount of them, and their respective *199 accounts on the books of Scott-Nickels were charged with $1,250 which they paid. In its income tax return for 1945, Scott-Nickels took a deduction of $5,500 as a loss on the sale of the fixtures and equipment to Gott in that year. The respondent disallowed the deduction. Opinion The only matter in controversy under this issue is whether Scott-Nickels sold the fixtures and equipment to Gott. On the basis of the testimony of Gott, who was produced as a witness by the respondent, in conection with the other evidence bearing on the matter, we have found as a fact that Scott-Nickels sold the fixtures and equipment to him. Accordingly we hold that the loss in question was deductible. Issue 5. Additions to Tax for Fraud Opinion The respondent determined that Scott-Nickels was liable for additions to tax for fraud under section 293(b) of the Internal Revenue Code of 1939 for the years 1940 through 1947. He has the burden of establishing fraud by clear and convincing evidence. The ground on which he now largely rests the foregoing determination is the failure of Scott-Nickels to record on its books and report as income for the respective years the amounts of gross receipts which *200 he (respondent) determined had been diverted by Henry Nickels and Dr. Johnson during such years. However, this ground has been disposed of adversely to the respondent by our holding under Issue 1, Supra. Nor do we find anything in the disposition of other issues, relating to officers' salaries, depreciation, and losses on the sale of property, involving comparatively small amounts, and disposed of by stipulation of the parties, which supports the respondent's determination as to fraud. We hold for the corporation on this issue. Issue 6. Expiration of Period of Limitations for Years 1940 Through 1942 Findings of Fact Scott-Nickels filed its corporation income and declared value excess profits tax and excess profits tax returns for 1940 and 1942 on March 25, 1941, and March 15, 1943, respectively. It filed its corporation income and declared value excess profits tax return for 1941 on March 16, 1942. No excess profits tax return was ever filed by it for 1941. The notice of deficiency was mailed to Scott-Nickels on January 30, 1952. Opinion The respondent makes no contention that if his determination as to fraud for 1940 through 1942 is not sustained, the period of limitations *201 for assessing corporation income and declared value excess profits tax and excess profits tax for 1940 and 1942 and corporation income and declared value excess profits tax for 1941, nevertheless, had not expired at the time of the mailing of the deficiency notice. In view of this and since it is clear that the 3-year period of limitations provided for n section 275(a) of the Code had expired prior to the time the notice of deficiency was mailed, we hold that the period of limitations has expired for the assessment of deficiencies in Scott-Nickels' income and declared value excess profits and corporation excess profits tax for 1940 and 1942 and its income and declared value excess profits tax for 1941. Since no corporation excess profits tax return for 1941 was ever filed by Scott-Nickels, any deficiency in corporation excess profits tax for that year may, under the provisions of section 276(a) of the Code, be assessed at any time. Issue 7. Addition to Excess Profits Tax for 1941 for Delinquency Opinion Because of the failure of Scott-Nickels to file an excess profits tax return for 1941, the respondent has determined an addition to the deficiency in its excess profits tax for *202 that year under section 291 of the Code, which provides for such addition "unless it is shown that such failure [to file return] is due to reasonable cause and not due to willful neglect." The petitioners take the position that, as reported on the corporation income tax return for 1941 of Scott-Nickels, its net income was insufficient to make it liable for filing an excess profits tax return; and, further, if we should sustain their position as to diverted gross reecipts of Scott-Nickels (which we have done, supra), a recomputation of its net income under Rule 50 will result in an amount insufficient to make it liable for an excess profits tax return. If a recomputation of the company's net income produces such results, then an addition to tax for delinquency would not be proper. Otherwise, the addition to tax is proper since it is not shown that failure to file an excess profits tax return was due to reasonable cause and not to willful neglect. Joseph E. Johnson. Issue 1. Respondent's Method of Determining Income Opinion Upon an examination of the books and records maintained by Dr. Johnson for the years 1940 through 1947, the respondent determined that they failed to *203 correctly reflect his net income for those years. Accordingly, the respondent determined his income for those years on the basis of increases in his net worth plus his nondeductible expenditures for the respective years. Dr. Johnson, in his petition, assigned error as to this action of the respondent. The respondent denied the error assigned. At the hearing the petitioners attempted to show that Dr. Johnson's income for the years involved could be correctly determined from his books and records. In addition, they contested the correctness of the respondent's determinations of net income on the basis of increases in net worth plus nondeductible expenditures. On brief, the petitioners not only make no contention that Dr. Johnson's books and records correctly reflected his net income but concede that the respondent's use of the method employed by him in determining net income was not improper. In view of that concession the respondent is sustained on this issue. Issue 2. Increases in Net Worth for the Years 1940 Through 1947 Findings of Fact In connection with this issue, the parties placed in evidence by stipulation, a joint exhibit designated 51-00 in which is listed, among other *204 things, the items of assets and liabilities of the petitioner which are in controversy. The item numbers used below are those shown in Ex. 51-00. With respect to Item 12d "Cash on hand" at the end of the years 1939 through 1947, Dr. Johnson on the following dates gave financial statements under oath to the First National Bank, Pikeville, Kentucky, in which he represented that on such dates he had the indicated amounts of "Cash on hand and in banks": Cash on hand
and in banks
February 7, 1934
$ 1,000
January 11, 1935
2,000
January 28, 1936
none
January 29, 1942
5,000
January 24, 1944
20,000
On the following dates he gave financial statements to the National Bank of Commerce, Williamson, West Virginia, in which he represented that on such dates he had the indicated amounts of "Cash on hand and in banks": Cash on hand
and in banks
August 31, 1942
$ 4,000
December 13, 1946
30,000
On December 30, 1942, Dr. Johnson, as collateral for a loan or loans, delivered to the First National Bank, Pikeville, Kentucky, two United States Treasury bonds in the amount of $5,000 each due in 1948. The bonds were returned to him by the bank on *205 October 9, 1944. On December 31 of each of the years 1939 through 1946, Dr. Johnson had cash on hand in the amount of $1,000. During 1945, he acquired from Henry Nickels 100 shares of stock in Premium Coals, Inc., Item 53, at a cost of $10,000. He continued to own the stock through December 31, 1947. The cost to Dr. Johnson of his one-half interest in the Scott-Nickels partnership was $16,500 which was represented by the surrender in 1939 to Henry Nickels of notes of Nickels for $1,500 and the payment to Nickels of $13,000 in 1939 and $2,000 early in 1940. The cost to Dr. Johnson of the shares of stock issued to him and Mrs. Johnson in 1940 by Scott-Nickels, the corporation, Item 50, was $16,500. At all times thereafter through December 31, 1947, the cost of those shares remained at $16,500. Dr. Johnson did not own any interest in the Terminal Grill during 1944 or 1945, Item 56, and at the end of that year was not liable on a loan owing by the Grill to the First National Bank, Williamson, West Virginia, Item 108. In 1946, Dr. Johnson acquired at a cost of $2,100, a one-half interest in the fixtures and equipment, Item 56, theretofore used by Charles D. Gott in the conduct *206 of the Grill and continued to own such interest through December 31, 1947. During the years 1942 through 1947, Mrs. Johnson owned an interest in certain mine cars and machinery which were leased to Premium Coals, Inc., Item 58. The cost of her interest was as follows on the indicated dates: Dec. 31, 1942
$ 2,125.00
Dec. 31, 1943
2,125.00
Dec. 31, 1944
2,118.75
Dec. 31, 1945
14,640.36
Dec. 31, 1946
14,040.36
Dec. 31, 1947
14,040.36
In 1944, Dr. Johnson acquired, at a cost of $2,406.25, an interest in certain mine equipment purchased from Elkhorn Coal Company, Item 59. In 1945, he increased his interest in the equipment at a cost of $2,406.25 and thereafter through December 31, 1947, his cost with respect to this property was $4,812.50. Aside from the interests in mine cars, machinery and equipment, referred to in the preceding two paragraphs and involving Items 58 and 59, Dr. and Mrs. Johnson did not during 1945, 1946 and 1947 own any other property of such character. Accordingly, in computing net worth at the end of the years 1945 through 1947, no amount is includible as an asset on account of Item 60, designated "Mine Equipment - Leased to Premium *207 Coals, Inc." The cost to Dr. Johnson for his one-half interest in Hazard Splint Coal Co., Item 70, was $3,000 on December 31, 1945. On December 31, 1944, Dr. Johnson held a note for $5,000 owing by Henry Nickels, Item 72a. In 1945, he cancelled the note as part of the consideration paid for a group of properties which he acquired from Nickels in that year. The note was not an asset of Dr. Johnson on December 31, 1945, or at anytime thereafter. On December 31, 1944, Dr. Johnson was indebted to Scott-Nickels on open account in the amount of $1,224.14, Item 104a, representing payments theretofore made by Scott-Nickels on his behalf. In 1945, Henry Nickels acquired from Dr. Johnson, the latter's one-half interest in a farm designoted Rye Cove Farm. In connection with the transaction, Nickels assumed payment of the indebtedness of $1,224.14 owing by Dr. Johnson to Scott-Nickels. Subsequently, Nickels paid the indebtedness to Scott-Nickels. The indebtedness was not a liability of Dr. Johnson on December 31, 1945 or at any subsequent time. In 1945, and as part of the consideration paid for certain properties which he acquired from Henry Nickels, Dr. Johnson assumed payment of a note *208 for $5,000 owing by Nickels to E. M. Howard, Item 111. Subsequently, but whether in 1945 or in a later year is not disclosed, Dr. Johnson paid the note. No amount is includible as a liability of Dr. Johnson on December 31, 1945, or on a later date on account of the note. Respecting Item 109, Depreciation Reserves, Dr. Johnson and Henry Nickels in September 1943, acquired one-half interests in a property known as the Bassett Building at a total cost to them of $18,500. Of such cost $13,500 was allocable to the building and $5,000 to the land. Opinion The petitioners concede on brief that Item 49a, 100 shares of common stock in Mineral Springs Products, Inc., involved in this issue but not mentioned in our findings, had no cost to Dr. Johnson and that with respect to that item no amount is to be included as an asset at the end of the years 1939 through 1944. The controversies involved in this issue relate primarily to the year of acquisition and the cost of certain assets, the cost of other assets admittedly owned on particular dates and the existence and amount of certain liabilities on particular dates. As we understand the position of the parties, our findings on this issue *209 will dispose of all matters now in controversy under the issue including those relating to the computation of depreciation reserves and capital gains. Except as to the amount of cash Dr. Johnson had on hand at the end of the years 1939 through 1946, discussion of the questions presented is not deemed necessary. The respondent did not determine that Dr. Johnson had any cash on hand at the end of the years 1939 through 1947 and his action in this respect is urged as error by petitioners. Relying on certain testimony of Dr. Johnson and others, the petitioners take the position that at the end of 1939, 1940, 1941 and 1942, Dr. Johnson had on hand, and undeposited, cash in the amounts of $40,000, $48,000, $58,000 and $64,500, respectively; that during the years 1943 through 1946, he deposited in the bank or invested the $64,500 on hand at the end of 1942 and that the approximate balances of the $64,500 on hand and undeposited at the end of 1943, 1944, 1945 and 1946 were $44,500, $29,000, $13,500 and $5,000, respectively; and that at the end of 1947, he did not have any cash on hand and undeposited. Dr. Johnson testified that when he began practicing medicine in 1921 he began accumulating *210 currency and that by 1933 he had accumulated between $20,000 and $25,000; that in 1934 and subsequent years he gradually increased the accumulation; that in April 1940 he counted the currency he then had, and which he was keeping in his office safe in Stone, Kentucky, and found that he had $42,000 which was in denominations of $50 and $100 and in packages of $5,000 each. He estimated that $40,000 of the accumulation was on hand on December 31, 1939 and that the remainder, $2,000, had been accumulated in 1940. He also testified that from April 1940 until 1942 he continued to accumulate currency, during which time he accumulated about $20,000 additional, so that by the end of 1942 he had about $60,000 in cash; that thereafter he did not make any further accumulation but made some investments out of the accumulation on hand and that by the end of 1947 his cash accumulation had been exhausted and at that time he did not have any cash on hand. He further stated that, at a time or times which he did not disclose, he deposited some of the cash accumulation in a bank or banks, the name or names of which he did not mention. He further testified that he did not remember the amount of the cash *211 accumulation at the end of any of the years 1940, 1941, and 1943 through 1946. In contrast to the foregoing testimony, which is to the effect that throughout the years 1934 through 1936, Dr. Johnson had a cash accumulation of more than $20,000, we find him giving financial statements under oath to the First National Bank, Pikeville, Kentucky, on February 7, 1934, January 11, 1935, January 28, 1936, in which he represented that on these dates he had cash on hand and in banks of only $1,000, $2,000 and none, respectively. Likewise, in contrast to his testimony to the effect that throughout 1942 he had cash on hand of $42,000 or more, we find that on January 29, 1942, he gave a financial statement under oath to the First National Bank at Pikeville in which he represented that on that date he had cash on hand and in banks of only $5,000. On August 31, 1942, he gave a financial statement to the National Bank of Commerce, Williamson, West Virginia, in which he represented that on that date he had cash on hand and in banks of only $4,000. The petitioners have made no attempt to reconcile the foregoing conflicting statements as to his cash accumulations and we find no basis of record for *212 doing so. Furthermore, an exhibit, prepared by a witness for the petitioners, which purports, among other things, to show the loans obtained by Dr. Johnson from banks during the years 1940 through 1947, shows a loan of $500 from the First National Bank at Pikeville on February 21, 1940, a loan of $3,125 from Harlan National Bank on December 18, 1940, a loan of $2,500 from First National Bank at Pikeville on November 15, 1941, a loan of $2,000 from Harlan National Bank on December 31, 1941, two loans totaling $3,000 from Harlan National Bank in January 1942, loans of $2,000, $2,500 and $7,500 from First National Bank at Pikeville on July 6, 1942, September 21, 1942 and December 8, 1942 and a loan of $5,000 from National Bank of Commerce on September 5, 1942. No explanation is offered as to the occasion for such comparatively small borrowings if, as Dr. Johnson's testimony indicates, he had $40,000 or more in cash over the years 1940 through 1942. Furthermore, no explanation is offered as to why on December 30, 1942, he deposited U.S. Treasury bonds in the amount of $10,000 with the First National Bank at Pikeville as collateral for a loan or loans if, as he testified, he had a cash *213 accumulation of $60,000 at the end of 1942. In addition to the testimony of Dr. Johnson with respect to the counting and amount of cash he had on hand in April 1940, the petitioners submitted the testimony of two other witnesses. Although these witnesses testified to seeing him remove from his safe and count some packages or bundles of currency and to hearing him say that the amount thereof was $42,000, their testimony shows that they did not know what amount was contained in the bundles or packages. In fact, some of the testimony of one of the witnesses was to the effect that Dr. Johnson actually counted only the money contained in a broken package and made no count of any of the remainder which was contained in unbroken packages. The record shows that when Dr. Johnson was interviewed by respondent's agents, on December 16, 1948, he was asked as to the amount of cash he had in 1940 and he replied that he did not know exactly and that thereupon he was asked if there was anything he could add that would clarify the situation so that the investigation could be brought to a close and he replied that there was not. From the record presented we are unable to sustain the contention *214 of petitioners as to the amounts of cash Dr. Johnson had on hand at the end of the years 1939 through 1946. However from the record before us as to his methods of operating and manner of living, we think it would be unrealistic to conclude that he had no cash on hand at the end of those years. In our opinion he had cash on hand of at least $1,000 at the end of each of the years 1939 through 1946. Issue 3. Gambling Losses Findings of Fact In each of the years 1940 through 1947, Dr. Johnson attended the Kentucky Derby races at Louisville, Kentucky. In some years he made bets on the Derby race amounting $600to or $700 and at times he bet on other races which were run on the day of the Derby race. In addition to betting at the Derby, he placed wagers with professional gamblers. He also played in a card club which met 12 or 15 times a year in which bets were made. Aside from some comparatively small losses sustained on wagering transactions which were paid in cash, his losses on wagering transactions were paid by check. The following is a statement of Dr. Johnson's losses on wagering transactions which were paid by check and of his gains from wagering transactions which were not *215 connected in any way with his losses from wagering transactions paid by check during the years indicated: Losses
Gains
1940
$ 2,966.20
$ 1,500
1941
5,376.80
5,000
1942
3,268.00
2,027
1943
4,304.55
4,466
1944
12,734.33
11,000
1945
619.00
1947
3,900.00
2,000
In determining Dr. Johnson's taxable net income for the following years, the respondent determined that the increases in net worth for such years should be increased by the following indicated amounts on account of gambling losses paid by check during those years: 1940
$ 2,966.20
1941
5,593.80
1942
3,070.00
1943
4,304.55
1944
12,734.33
1945
619.00
1947
3,900.00
Opinion The petitioners take the position that the evidence relating to Dr. Johnson's wagering gains establishes that he had gains from wagering transactions, which were not involved in the wagering losses paid by check, of approximately $3,000 in 1940, $5,580 in 1941, $3,027 in 1942, $4,466 in 1943, $13,000 in 1944, and approximately $2,000 in 1947. On the basis of that position the petitioners contend that the respondent should not have added any amount to increases in net worth for the years 1940, *216 1941, 1943 and 1944, and not more than $43 for 1942 and not more than $1,900 for 1947. From a consideration of the evidence bearing on this issue, we have concluded and found as a fact that Dr. Johnson had gains for the years and in the amounts set out in our findings from wagering transactions which were not connected in any way with the losses from wagering transactions paid by check. The amounts so found will be treated as offsets against the losses from wagering transactions paid by check as set out in our findings. Issue 4. Personal Living Expenses Findings of Fact During the years 1940 through 1947, Dr. Johnson's family consisted of himself, his wife, and a daughter who was born in 1930. Prior to September 1941, the nurse employed by Dr. Johnson lived in his home. The daughter lived at home and attended local schools until about September 1947 when she went away to college in Tennessee. Since about 1929, Dr. Johnson has had the same box, containing six seats for the Kentucky Derby races. In some, if not all of the years 1940 through 1947, he has had one or more guests in his box. In addition to going to Louisville, Kentucky, each year for the Derby races, on which *217 occasions he usually spent two days and nights away from home, Dr. Johnson attended the annual meetings of the Kentucky State Medical Association which were held at Louisville, Lexington, or elsewhere in Kentucky. He was away from home three or four days when he attended those meetings. Dr. Johnson took annual vacations in Georgia and Florida. On these occasions he usually spent a week hunting in Georgia and from there went to Florida where he usually spent a week. He seldom spent more than two weeks on these vacations. In each of the years 1946 and 1947, he also went on a hunting trip to South Dakota and was away from home about 11 days on each trip. Mrs. Johnson accompanied her husband on the hunting trip to South Dakota in 1947 and she usually accompanied him when he attended the meetings of the Kentucky State Medical Association. She and their daughter usually made summer visits to the home of Mrs. Johnson's mother, who lived about 130 miles from Stone, Kentucky. Occasionally, Mrs. Johnson and her daughter visited Mrs. Johnson's sister who lived in Richmond, Virginia, and when doing so they rode on a Norfolk and Western Railway pass. Throughout the years 1940 through 1947, *218 Mrs. Johnson had domestic help for two or more days a week and in addition, from October or November 1944 until the end of 1947, employed a woman to do the family laundry and the laundry for Dr. Johnson's office. Mrs. Johnson maintained a charge account at a store in Richmond, Virginia, and at a store in Louisville, Kentucky. Dr. Johnson had a charge account at another store in Louisville. In determining Dr. Johnson's taxable net income for the years 1940 through 1947, the respondent determined that the increases in net worth for such years should be increased by $10,000 for each of the years 1940 through 1944 and by $12,000 for each of the years 1945 through 1947 on account of personal living expenses. Dr. Johnson's personal living expenses were $7,500 for each of the years 1940 and 1941, $8,500 for each of the years 1942 through 1946 and $10,500 for 1947. Opinion Concededly, a portion of Dr. Johnson's personal living expenses was paid by check and the remainder was paid in cash. No record was maintained as to the expenses paid in cash. The respondent in determining Dr. Johnson's personal living expenses determined that the following amounts for the indicated years were *219 paid by check: 1940
$ 6,236.72
1941
5,290.68
1942
9,133.34
1943
7,351.58
1944
8,328.45
1945
7,574.02
1946
5,742.57
1947
10,705.50 The respondent further determined that personal living expenses were paid in cash in the amount of the difference between the foregoing amounts and the amounts determined by him as set out in our findings. Contending that the record shows that the respondent's determinations as to the amounts paid by check and by cash are erroneous, the petitioners urge that Dr. Johnson's personal living expenses were approximately as follows for the indicated years: 1940
$5,000
1941
5,200
1942
5,700
1943
5,000
1944
5,500
1945
5,000
1946
5,500
1947
8,000
The evidence shows that in determining the amounts paid by check for each of the years in question, the respondent included the amounts of a number of checks which were issued for purposes not related to the personal living expenses of Dr. Johnson. After giving full effect to the foregoing and the other evidence bearing on the question, including the evidence relating to cash expenditures for personal living expenses, we are of the opinion that Dr. Johnson's *220 personal living expenses for the years in question were in the amounts set forth in our findings. Issue 5. Payments Made by Checks Not Verifiable as Personal Expenses or Business Expenses Findings of Fact In determining Dr. Johnson's taxable net income for the years 1941, 1942 and 1944 through 1946, the respondent determined that the increases in net worth for such years should be increased by the following indicated amounts on account of payments made by check and which he was not able to verify as having been made for personal expenses or business expenses: 1941
$ 9,611.63
1942
10,765.29
1944
7,402.86
1945
2,295.59
1946
1,418.95
The parties have stipulated as to the purposes of all the payments made by check involved in the foregoing except as to those with respect to which we make findings of fact below. The payments thus stipulated to were for personal expenses, or business expenses, or for other items which were reflected in respondent's determination of increases in net worth. The purpose for which Dr. Johnson used a cashier's check for $1,000 issued to him on December 30, 1941 by the National Bank of Commerce, Williamson, West Virginia, is *221 not disclosed. A check for $962.67, dated December 30, 1941, and issued by Dr. Johnson to Lawrence Drilling Company was in part payment for the services of that company in drilling a gas well on Pond Creek which proved to be a dry well. The purpose for which Dr. Johnson issued a check for $125 dated May 20, 1942 to Burger Coal Company is not disclosed. Bruce S. Johnson issued a check for $1,350 dated January 27, 1944 to T. R. Middleton for an interest in certain mine cars purchased by her from Middleton. A check dated April 21, 1944 for $62.50 issued by Dr. Johnson to T. R. Middleton was in payment for mine supplies purchased by him from Middleton. Checks bearing the following dates and for the indicated amounts were issued by Dr. Johnson to Henry Nickels in payment of Dr. Johnson's share of the expenses of farming operations conducted by them jointly: January 4, 1944
$ 142.56
March 6, 1944
414.46
April 3, 1944
1,840.47
May 4, 1944
729.15
June 6, 1944
207.98
July 19, 1944
213.75
September 27, 1944
1,650.70
October 11, 1944
851.51
A check dated January 26, 1944 for $774.60 issued by Dr. Johnson to Tazewell Farm Bureau was in payment for fertilizer *222 purchased and used for farming purposes. The purpose for which Dr. Johnson issued a check for $280.61 dated June 5, 1944 to Hazard Splint Coal Company is not disclosed. Dr. Johnson issued checks dated January 4, 1945 and March 3, 1945 for $692 and $132.24, respectively, to Henry Nickels. The purpose for which these checks were issued is not disclosed. A check dated June 7, 1945 for $1,222.85 issued by Dr. Johnson to R. C. Ball was in payment for a carload of corn purchased by him from Ball. The purpose for which Dr. Johnson issued a check dated November 19, 1946 for $224.03 to Henry Nickels is not disclosed. Checks issued by Bruce S. Johnson dated November 19, 1946 and December 4, 1946, respectively, for $625 each to E. M. Howard and N. D. Howard, respectively, were in payment to them of their respective shares of the proceeds of sale of certain mining equipment in which the three owned interests. Opinion On the basis of the facts stipulated to by the parties and the facts found by us with respect to this issue, we hold that only the following amounts for the indicated years are to be added to increases in net worth on account of payments by check involved in our findings *223 which are not verifiable as made for personal or business purposes: 1941
$1,000.00
1942
125.00
1944
280.61
1945
824.24
1946
224.03
Issue 6. Additions to Tax for Fraud Findings of Fact Aside from books and some card records kept with respect to his medical practice, the records maintained by Dr. Johnson throughout the years 1940 through 1947, with respect to his affairs consisted of bank statements, check stubs, cancelled checks, and miscellaneous memoranda and papers. Dr. Johnson's income tax returns for 1940 and 1941 were prepared by John C. McNeil, who had been a certified public accountant since 1920, and who, with respect to each return, spent a day examining Dr. Johnson's records and conferring with him about his affairs. On the basis of the information thus obtained, the accountant considered that he had sufficient information from which to prepare correct returns and that the returns he prepared were correct. Dr. Johnson's income tax returns for the years 1942 through 1947 were prepared by T. R. Joseph, a public accountant, who had been in practice in Williamson, West Virginia, since 1925. Joseph prepared the returns from Dr. Johnson's records, *224 from information obtained in conference with Dr. Johnson about his affairs, and from information he obtained from the books of Scott-Nickels, which Joseph audited. On the basis of the information thus obtained, Joseph considered that he had sufficient information upon which to prepare correct returns for the years 1942 through 1947 and that the returns he prepared for those years were correct. In connection with the sale of a farm in 1944, Dr. Johnson acquired a note owing by C. M. Puckett, on which $5,000 was owing by Puckett at the end of 1944, $4,000 at the end of 1945, and which was paid in full during 1946. Although Puckett made payments of interest in undisclosed amounts on the note in 1945 and 1946, Dr. Johnson did not report any part thereof as income in his returns for those years. Dr. Johnson owned United States Government coupon bonds on the following dates which had the indicated costs: December 31, 1942
$10,003.84
December 31, 1943
11,004.67
December 31, 1944
21,005.91
December 31, 1945, 1946,
1947
26,005.91
The dates of issue, dates due and the income tax exemption features, if any, are not disclosed with respect to any of the bonds. Bonds *225 of a cost of $5,000 acquired in 1945 bore interest at the rate of 1 1/2 per cent per annum. The interest rate borne by the remainder of the bonds is not disclosed. In his income tax returns for the years 1942 through 1947, Dr. Johnson did not report any income with respect to interest on the foregoing bonds. The following is a statement of the amounts of net income reported by Dr. Johnson in his income tax returns for the indicated years and the amounts determined by the respondent as the correct net income for the respective years: Net Income
Net Income
Determined
Year
Reported
by Respondent
1940
$ 7,992.16
$20,549.33
1941
16,890.59
28,592.39
1942
26,635.29
45,460.60
1943
39,705.65
86,056.10
42,376.19 *
88,926.14 *
1944
38,111.79
94,806.84
1945
30,584.96
53,779.19
1946
30,883.27
58,194.00
1947
43,726.83
81,997.45
Opinion In support of his determination of additions to tax for fraud for each of the years in controversy, the respondent advances the following contentions: (1) that Dr. Johnson failed to report as income for the respective years the amount of the receipts of Scott-Nickels which *226 he diverted from that corporation, (2) that there are wide differences between the net income reported for the respective years and the correct net income as determined by the respondent for such years, and (3) that Dr. Johnson failed to keep proper books and records. Since, as we conclude above, in our consideration of the case of Scott-Nickels, that the record failed to establish that there was any diversion of the receipts of that corporation by Dr. Johnson, the first of the foregoing contentions of the respondent must fail for lack of factual support. A period of approximately seven months expired between the time the hearing of the three proceedings here involved began and the time the hearing ended. During that period the parties had a number of conferences as a result of which various concessions and agreements were made and numerous stipulations were entered into. As a result of such concessions, agreements and stipulations and of our findings and holdings herein, numerous adjustments will be required in the respondent's determinations, which will effect extensive reductions in Dr. Johnson's net income as determined by the respondent. In connection with the foregoing *227 it is observed that the respondent's agents testified to finding only two sources from which Dr. Johnson had income but from which he reported no income whatever, namely, the Puckett note and the Government bonds. However, the agents gave no indication of the amounts or approximate amounts of interest from these sources that were involved for any of the years in controversy. In view of this, and the record not showing otherwise, we conclude that the taxable amounts involved were comparatively small. Dr. Johnson explained his failure to report interest from the Puckett note as being due to oversight and his failure to report interest from the Government bonds as being due to his lack of knowledge until 1948, when he clipped some coupons from the bonds, that the interest thereon was taxable. Our attention has not been called to anything, nor have we found anything of record, from which we can conclude that his explanations in those respects are not true. Concededly, the records maintained by Dr. Johnson for the years 1940 through 1947 were inadequate for the purpose of a correct reporting of income. However, his returns for those years were prepared from those records by accountants *228 who had been in practice from 17 to 20 years or longer, and who considered the records adequate for income reporting purposes. Prior to the investigation which give rise to the instant proceeding, Dr. Johnson's returns for the years 1940, 1941 and 1942 were investigated by an agent of the respondent and deficiencies in tax were determined. But those deficiencies do not appear to have resulted from any inadequacy of the records maintained nor does it appear that the agent making the investigation considered or informed Dr. Johnson that the records were inadequate. Although it is apparent from the record in these proceedings that Dr. Johnson and those who assisted him in the maintenance of his records neglected to do much that would have added to the adequacy and completeness of the records, it does not appear that such neglect was for the purpose of concealing income, or for deceiving or misleading anyone who might examine those records. The fraud meant by the statute is "actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Mere negligence does not establish either." Mitchell v. Commissioner, 118 Fed. (2d) 308. *229 See also Wiseley v. Commissioner, 185 Fed. (2d) 263. Viewing the record before us in the light of the foregoing and considering that the respondent has the burden of establishing fraud by clear and convincing evidence, we hold for the petitioner on this issue. Issue 7. Expiration of Period of Limitations for Years 1940 and 1941 Findings of Fact Dr. and Mrs. Johnson filed their joint income tax returns for 1940 and 1941 on March 14, 1941 and March 16, 1942, respectively. The notice of deficiency was mailed on January 30, 1952. Opinion The respondent makes no contention that if his determination as to fraud for 1940 and 1941 is not sustained, the period of limitations for assessing income tax for those years, nevertheless, had not expired at the time of the mailing of the notice of deficiency. In view of this and since it is clear that the three-year period of limitations provided for in section 275(a) of the Code had expired prior to the mailing of the notice of deficiency, we hold for the petitioners on this issue. Issue 8. Additions to Tax Because of Substantial Underestimation of Tax for the Years 1943 Through 1947 Opinion Pursuant to motion granted *230 at the hearing, the respondent filed an amendment to his answer. In the amendment the respondent alleged that Dr. Johnson substantially underestimated his tax for the years 1943 through 1947 and therefore for each of the years was liable for the addition to tax prescribed in section 294(d) of the Code and made claim for such additions to tax for the respective years. In an amendment to his reply, Dr. Johnson denied the respondent's allegations and denied that the respondent is entitled to the additions claimed. The respondent has the burden as to this issue. He offered no evidence directed to the issue and on brief has made no contention with respect thereto. We assume he has abandoned the issue and accordingly deny his claim for lack of evidence. Estate of Henry Nickels, Deceased, Catherine Nickels, Executrix. Issue 1. Respondent's Method of Determining Income Opinion Upon an examination of the books and records maintained by Henry Nickels for the years 1940 through 1947, the respondent determined that they failed to correctly reflect his income for those years. Accordingly the respondent determined the income for those years on the basis of increases in net worth plus *231 nondeductible expenditures for the respective years. The respondent's action was assigned as error by the executrix in her petition. The respondent denied the error assigned. At the hearing the petitioners attempted to show that Henry Nickels' income for the years involved could be correctly determined from his books and records. In addition, they contested the correctness of the respondent's determinations of net income on the basis of increases in net worth plus nondeductible expenditures. On brief the petitioners not only make no contention that Henry Nickels' books and records correctly reflected his net income but concede that the respondent's use of the method employed by him in determining net income was not improper. In view of that concession the respondent is sustained on this issue. Issue 2. Increases in Net Worth for the Years 1940 through 1947 Findings of Fact In connection with this issue the parties placed in evidence a joint exhibit designated 97-XX in which are listed, among others, the items of assets and liabilities of Henry Nickels which are in controversy. The item numbers used below are those shown in Ex. 97-XX. With respect to Item 5(c) "Cash on Hand" *232 at the end of the years 1939 through 1947, Henry Nickels, in an application sworn to by him on October 21, 1937 and filed by him on October 22, 1937 with the West Virginia Public Service Commission, stated that his net worth was $3,000 and that his total assets consisted only of motor equipment of a value of $3,000. At a hearing before the West Virginia Public Service Commission on the foregoing application on November 16, 1937, he testified that he was worth $2,000 in cash over and above his equipment. In an application sworn to by him on July 12, 1938 and filed by him on July 21, 1938 with the West Virginia Public Service Commission, he stated that his total assets consisted only of motor equipment of a value of $6,500. In an application sworn to by him on July 29, 1939 and filed on August 7, 1939 with the West Virginia Public Service Commission, he stated that his assets totaled $3,884.60. At the end of 1939, 1940 and 1941, Henry Nickels had cash on hand in the amounts of $16,000, $13,000 and $4,000, respectively. In 1945, he acquired from Dr. Johnson the latter's one-half interest in the Rye Cove Farm, Item 23, and the improvements thereon, Item 50, at costs of $12,850 and *233 $1,915.79, respectively. At or about the same time he also acquired Dr. Johnson's one-half interest in the livestock on the farm, Item 47, at a cost of $3,045. The foregoing were his costs of such interest in those properties at December 31, 1945 and December 31, 1946. In 1944, Nickels purchased from Premium Coals, Inc., 100 shares of its capital stock, Item 37, for $10,000 which continued to be his cost on December 31, 1944. The cost to Nickels of the shares of stock in Scott-Nickels issued to him and Mrs. Nickels, Item 38, was $4,447.13 on December 31, 1940. At all times thereafter pertinent herein his cost of that stock remained at that amount. Prior to 1946, Nickels owned no interest in the Terminal Grill, Item 43. In 1946, he acquired a one-half interest in the fixtures and equipment in the Grill at a cost of $2,100, which continued to remain at that amount through December 31, 1947. During 1944, Nickels acquired at a cost of $10,000 an interest in certain mine equipment, Item 50a, which was leased to Premium Coals, Inc. His cost remained at that amount on December 31, 1944. In December 1944, the Nickels acquired jointly a property known as the Ammar Building in Williamson, *234 West Virginia, Item 14 (Depreciation Schedule), at a total cost of $15,000. Of the total cost $2,500 was allocable to the land and $12,500 to the building. The building had a useful life of 25 years at the time they acquired it. Late in 1946, they made improvements to the building. Item 61, at a cost of $3,000 which remained at that amount on December 31, 1946 and December 31, 1947. The improvements had a life equal to the remaining life of the building. In May 1944, Nickels acquired a property known as the Riley Building in Williamson, West Virginia, Item 11 (Depreciation Schedule), at a total cost of $17,000. The useful life of the building was 25 years at the time he acquired it. At December 31, 1947, Nickels had no "Undisclosed Assets Cash Available," Item 69. On December 31, 1945, he had no liability to the First National Bank of Williamson on account of the Terminal Grill, Item 101. In connection with his acquisition of Dr. Johnson's interest in the Rye Cove Farm in 1945, Nickels assumed payment of an indebtedness of $1,224.14 owing by Dr. Johnson to Scott-Nickels, Item 102(d), and in 1947 paid the indebtedness. The foregoing constituted a liability of Nickels at December 31, 1945 and *235 December 31, 1946. Opinion The controversies involved in this issue relate largely to the year of acquisition and cost of certain assets, the cost of other assets admittedly owned on particular dates, and the existence and amounts of certain liabilities. As we understand the position of the parties, our findings on this issue will dispose of all matters in controversy under the issue, including those relating to the computation of depreciation reserves and capital gains. With the exception of Item 5(c), "Cash on Hand," Item 68, "Undisclosed Assets by Specific Items," and Item 109, "Premium Coals, Inc.: Dr. J. E. Johnson, Dr. E. M. Howard," discussed below, a discussion of the questions involved in this issue is not deemed necessary. As to Item 5(c), Cash on Hand, the respondent did not determine that Nickels had any cash on hand at the end of the years 1939 through 1947 and petitioners contend that his failure in this respect was error. Relying on, among other things, the testimony of various witnesses, including Mrs. Nickels, the petitioners take the position that at the end of 1939, 1940, 1941 and 1942, Nickels had on hand cash in the amount of approximately $55,000, at the *236 end of 1943, approximately $16,000, at the end of 1946, approximately $17,500 and at the end of 1947, approximately $30,000. The petitioners concede on brief that he had no cash on hand at the end of 1944 and 1945. We have considered the testimony relied on by petitioners, together with the other evidence bearing on the question, and have found that at the end of 1939, 1940 and 1941, Henry had cash on hand in the amounts of $16,000, $13,000 and $4,000, respectively. We are unable to find that at the end of 1942, 1943, 1946 and 1947, he had cash on hand in the amounts contended for by petitioners or in any other significant amounts. Mrs. Nickels' testimony suggests aversion by Henry to keeping his money on deposit in banks as the probable reason as to why he had on hand at the end of the years in question the substantial sums the petitioners claim that he had. While such might have been the reason for his having on hand the amounts he had at the end of the years prior to 1942, we fail to see the plausibility of such an explanation for his holding at the end of later years the amounts here claimed by petitioners to have been on hand at the end of such years. The stipulated evidence shows *237 that by the end of 1941 he had made an investment of $1,000 in the stock of the First National Bank, Williamson, West Virginia, that in 1943 he made an additional investment of $4,000 in that bank's stock, that during 1945 he made a further investment in the bank's stock so that by the end of 1944 and at the end of all later years through 1947, his total investment in the bank's stock amounted to $12,500. Further, the evidence shows that during the years 1943 through 1947 he maintained a checking account at that bank. Respecting the contention of petitioners as to cash on hand at the end of 1947, Mrs. Nickels testified that except for cash on deposit in the bank at the end of 1947, she did not know of any cash accumulation Henry had at the end of 1947. Respecting Item 68, Undisclosed Assets by Specific Items, the respondent included in the assets of Henry Nickels on account of undisclosed assets the amounts of $17,500 and $30,000 at the end of 1946 and 1947, respectively, on the ground that in 1946 and 1947 he received cash in the amounts of $17,500 and $12,500, respectively, the disposition of which he was unwilling to explain. In their argument, considered in the immediately preceding *238 paragraph and there rejected, the petitioners took the position that the amounts of $17,500 and $30,000 represented cash on hand at the end of 1946 and 1947, respectively. On brief, petitioners state that the $17,500 and $30,000 represented either cash on hand at the end of 1946 and 1947, respectively, or undisclosed assets at the end of the respective years, but not both. In view of that statement and since we have heretofore concluded that those amounts did not represent cash on hand at the end of the respective years and the record not disclosing error in the respondent's determination as to this item, we sustain his action. As to Item 109, Premium Coals, Inc., the parties stipulated at the hearing that on December 31, 1944, Henry Nickels was indebted to Dr. Johnson in the amount of $5,000 on a note and was also indebted to Dr. Howard in a like amount on a note. In submitting Ex. 97-XX the parties indicated that they were in disagreement as to whether Henry Nickels was liable on the foregoing items of indebtedness at the end of 1945, 1946 and 1947. The respondent did not determine that Henry had any liability on these items of indebtedness at the end of such years. At the hearing *239 the respondent took the position that Henry had no liability at the end of those years and the petitioners take a like position on brief. In this situation and the record failing to show otherwise, we conclude that Nickels had on liability at the end of 1945, 1946 and 1947 on the items of indebtedness in question. Issue 3. Personal Living Expenses Findings of Fact During the years 1940 through 1947, Henry Nickels' family consisted of himself, Mrs. Nickels and their son who was born in 1930. The son lived at home and went to local schools. They lived in their own home. Henry also contributed to the support of Mrs. Molly Alley, the mother of Mrs. Nickels, who lived apart from Henry and his family. Except for a period of about a year during 1945 and 1946 when Henry was in ill health, he and Mrs. Nickels usually spent about 10 hours or more a day in the conduct of the business of Scott-Nickels. They dressed plainly and most of the time Henry wore work clothes. They did little entertaining and seldom went out. Henry and his family usually took their meals at home. A substantial portion of their food was obtained from the farms of Henry and Mrs. Nickels, or from the farms of their *240 parents. The remainder of their food was purchased in Williamson. Henry smoked moderately and drank occasionally. Mrs. Nickels did not smoke or drink. Mrs. Nickels did not have any domestic help until 1946 when she employed a woman who rendered service from two to four days a week. Henry or his brother did the repair and maintenance work on Henry's car. During the years 1940 through 1947, Henry went on one or two one-week hunting trips to Georgia. He attended the Kentucky Derby twice. In 1947, Henry and Mrs. Nickels went on an 11-day fishing and hunting trip to South Dakota. Except for the foregoing, they took no extensive pleasure trips. In determining Henry's taxable net income for the years 1940 through 1947, the respondent determined that the increases in net worth for such years should be increased by $10,000 for each of the years 1940 through 1944 and by $12,000 for each of the years 1945 through 1947 on account of personal living expenses. Henry's personal living expenses were $3,500 for the years 1940 and 1941, $5,000 for the years 1942 through 1945 and $7,000 for the years 1946 and 1947. Opinion Taking the position that the record shows that the respondent's determination *241 of Henry's personal living expenses for the years in question was excessive, the petitioners contend that such expenses were approximately $2,000 for 1940 and 1941, $2,500 for 1942 through 1944, $3,500 for 1945 and $5,000 for 1946 and 1947. Throughout the years 1940 through 1947, Henry's family consisted of himself, Mrs. Nickels and their son. In his income tax returns for the years 1942 through 1947, Henry claimed Mrs. Molly Alley, mother of Mrs. Nickels, as a dependent and in his returns for the years 1942 through 1946, he also claimed Jennie Nickels, an orphan cousin, as a dependent. While the notice of deficiency shows that for the years 1940 through 1947, Henry was allowed credit for one dependent, neither it nor the record otherwise indicates for whom the credit was allowed. The evidence shows that Henry contributed to the support of Mrs. Alley during the years here involved but no specific amount is shown for any year. Although the evidence does not specifically show that Henry contributed to the support of Jennie Nickels, we think the fact that he claimed her as a dependent for the years 1942 through 1946 indicates that during those years he made some contribution to her support. *242 From the evidence bearing on this issue we have concluded that Henry's personal living expenses were in the amounts set out in our findings. Issue 4. Apportionment of Income to Catherine Nickels Findings of Fact In connection with this issue the parties have listed in the joint exhibit 97-XX, heretofore referred to, the items in controversy which relate to the income of Mrs. Nickels for the years 1941 through 1947, for which years she filed separate returns. Our findings as to controverted items follow: Mrs. Nickels received a salary of $1,793 from Scott-Nickels during 1946. During 1943 and 1945, Mrs. Nickels received dividends from Scott-Nickels in the amounts of $2,100 and $4,200, respectively. She received from Pikeville National Bank interest on her savings account as follows for the years indicated: 1942
$66.01
1943
82.87
1944
42.12
1945
$42.53
1946
42.96
1947
43.40
For the indicated years she received rental income, after allowances for depreciation, as follows: 1941
$122.50
1942
358.75
1943
447.50
1944
480.84
1945
$1,747.50
1946
1,407.50
1947
1,674.17
Opinion With respect to this issue the parties, in *243 putting Ex. 97-XX into the record, have submitted for determination questions as to the amounts of particular items of income and deductions of Mrs. Nickels for the years 1941 through 1947, for which she filed separate income tax returns. Our findings as to salary, dividends, interest and rental income dispose of the questions relating thereto and discussion as to those items is not deemed necessary. In determining the income apportionable to Mrs. Nickels, the respondent did not determine that she had any income or loss from farming operations for the years 1941 and 1942 and 1944 through 1947. He determined that she had a loss of $3,123.55 for 1943. The parties have stipulated that Mrs. Nickels had no gain or loss from farming in 1941 and 1942. The petitioners take the position that for the years 1943, 1944, 1946 and 1947, she had losses from farming of $57.30, $331.76, $517.30 and 99 cents, respectively, and that for 1945 she had income of $898.63 from farming. The petitioners rest their position on certain computations made by one of their witnesses who had no personal knowledge of the factual elements involved. Inasmuch as the petitioners failed to establish an evidentiary basis *244 which supports the computations, the petitioners must fail for lack of proof. Accordingly, the action of the respondent with respect to the years 1941 through 1947 is sustained. In his determination of income apportionable to Mrs. Nickels the respondent did not apportion any capital gains or losses to her for any of the years 1940 through 1947. The Rye Cove Farm and the improvements and livestock thereon, heretofore mentioned under Issue 2, were sold in 1947. The petitioners take the position that the sale of those properties resulted in a capital loss of $2,859.14 of which $1,000 was deductible and that the latter amount should be apportioned to Mrs. Nickels on the ground that she was the owner of the properties sold. While the record herein indicates that title to the farm was in the name of Mrs. Nickels at the time of the sale, it does not show that any portion of the purchase price of the farm or other properties involved was paid by her. The respondent's determination and such evidence as there is bearing on the question are to the effect that Henry Nickels paid the purchase price of the properties. Accordingly, we sustain the respondent in not apportioning to Mrs. Nickels any *245 loss from the sale of the properties in question. The respondent determined that taxes in the amounts of $190.53 and $258.46 were to be apportioned to Mrs. Nickels for 1946 and 1947, respectively. In submitting Ex. 97-XX the parties stipulated that $190.53 was to be apportioned to her for 1946 and indicated that a controversy existed as to the amount to be apportioned for 1947. In the computations of farm losses mentioned above, an amount of $258.46 was deducted for taxes in computing the losses contended for by petitioners for 1947 but which we have held the petitioners failed to establish. Whether the foregoing item was the same item involved in the respondent's determination for 1947 we are not able to determine. However, since the record does not show that any greater amount of taxes than $258.46 was apportionable to Mrs. Nickels, we sustain the respondent's action. Issue 5. Additions to Tax for Fraud Findings of Fact The records maintained by Henry Nickels consisted of bank statements, check stubs, cancelled checks, and miscellaneous memoranda, booklets and papers. It is not now know whom Henry employed to prepare his income tax returns for 1940 and 1941. The returns *246 for 1942 through 1947 were prepared by T. R. Joseph, a public accountant of Williamson, West Virginia, who was auditor for Scott-Nickels, and who also prepared its and Dr. Johnson's income tax returns for the years 1942 through 1947. Joseph prepared the returns from information furnished him, orally and in writing, by Henry and Mrs. Nickels, and after a discussion of the information with them. The only check or verification he made of the information furnished him was of the books of Scott-Nickels with respect to salaries and dividends received from that corporation. On the basis of the information obtained in the foregoing manner, Joseph considered that the returns he prepared for Henry Nickels were correct. The following is a statement of the amounts of net income reported by Henry Nickels in his income tax returns for the indicated years and the amounts determined by respondent as the correct net income for the respective years: Net Income
Net Income
Determined
Year
Reported
by Respondent
1940
$ 3,175.81
$15,718.18
1941
5,972.41
22,852.01
1942
4,528.14
19,670.35
1943
7,237.01
60,203.94
7,974.06 *
60,940.99 *
1944
5,531.23
35,774.53
1945
9,068.68
46,511.13
1946
12,192.03
23,474.36
1947
12,861.64
15,538.36
*247 Opinion In support of his determination of additions to tax for fraud for each of the years in controversy, the respondent advances contentions similar to those advanced in the case of Dr. Johnson, namely, (1) that Henry Nickels failed to report as income the receipts of Scott-Nickels which he diverted from that corporation, (2) that there are wide differences between the net income reported for the respective years and the correct net income as determined by respondent for such years, and (3) the failure to keep proper books and records. Since as we concluded in the case of Scott-Nickels the record failed to establish that there was any diversion of the receipts of that company by Henry Nickels, the first of the foregoing contentions of the respondent must fail because of a lack of factual support. While it is true that the amounts of net income determined by respondent for the respective years is in most instances greatly in excess of that reported for such years, various concessions made by the respondent during the hearing as well as the agreements and stipulations entered into by the parties will require numerous adjustments in the respondent's *248 determinations and will result in extensive reductions in net income as determined by respondent. Also, further reductions in net income will result from our findings and holdings herein. In view of the foregoing, we are unable to find that the differences between the net income reported and that determined by the respondent warrant the conclusion implied by the respondent's contention with respect to such differences. Concededly the books and records maintained by Henry Nickels for the years in controversy were inadequate for the purpose of determining his income and deductions for such years and his returns for those years were not correct. While we do not know anything as to who prepared Henry's returns for 1940 and 1941 and as to the information from which they were prepared, the record is clear that Joseph, an accountant with more than 15 years' experience in accounting and income tax work, prepared the returns for later years. For the preparation of the returns Joseph was furnished certain written data, which, when found to be inadequate, was supplemented, at Joseph's request, by oral information furnished by Henry or Mrs. Nickels. So far as appears, Joseph did not at any time *249 indicate to Henry that his method of keeping records was inadequate for tax purposes. Although Henry had died prior to the hearing herein and was not present to state the effect on him of the procedure employed by Joseph in preparing the returns, we think such procedure followed by one of Joseph's experience would cause a taxpayer to conclude that his method of keeping records was adequate for the preparation of correct income tax returns. For all that appears such was the effect on Henry. Under these circumstances, we cannot find that the inadequacy of the records was due to an intent on the part of Henry or Mrs. Nickels to conceal income or to deceive and mislead anyone in the investigation of his tax liability. From a consideration of the record presented, we fail to find that the incorrectness of Henry's returns for the years involved here was the result of intentional wrongdoing and for the purpose of evading tax. We hold for the petitioner on this issue. Issue 6. Expiration of Period of Limitations for Years 1940 and 1941 Findings of Fact Henry and Mrs. Nickels filed their joint income tax return for 1940 on March 15, 1941. Henry filed his income tax return for 1941 *250 on March 12, 1942. The notice of deficiency was mailed on January 30, 1952. Opinion On brief the petitioners contend that in the absence of a finding of fraud, the period of limitations for the assessment of income tax for the years 1941, 1942 and 1943 had expired at the time of the mailing of the notice of deficiency. Since the pleadings put in issue the question of limitations only as to the years 1940 and 1941, we limit our consideration and determination as to only those years. The respondent does not make any contention that if his determination as to fraud for 1940 and 1941 is not sustained, the period of limitations for assessing income tax for those years, nevertheless, had not expired at the time of the mailing of the notice of deficiency. In view of this and since the respondent's determination as to fraud has not been sustained and since it is clear that the 3-year period of limitations provided for in section 275(a) of the Code had expired prior to the mailing of the notice of deficiency, we hold that assessment of any deficiencies in income tax for 1940 and 1941 is now barred by expiration of the period of limitations. Issue 7. Additions to Tax Because of Substantial *251 Understimation of Tax for the Years 1943 Through 1947 Opinion Pursuant to motion granted at the hearing, the respondent filed an amendment to his answer. In the amendment the respondent alleged that Henry Nickels substantially underestimated his tax for the years 1943 through 1947 and therefore for each of the years was liable for the addition to tax prescribed in section 294(d) of the Code and made claim for such additions to tax for the respective years. In an amendment to her reply, the executrix denied the respondent's allegations and denied that respondent is entitled to the additions claimed. The respondent has the burden as to this issue. Since he offered no evidence directed to the issue and on brief has made no contention with respect thereto, we assume he has abandoned the issue. Accordingly, his claim for the additions to tax is denied for lack of proof. Prior to the respondent's issuance of the notices of deficiencies involved herein, two of his agents made an investigation of the tax liability of Scott-Nickels, Dr. Johnson and Henry Nickels for the years 1940 through 1947. One of the agents stated that he spent a total of 120 working days on the investigation. *252 Although the other agent did not state the amount of time he devoted to the investigation, the record indicates that he spent approximately the same amount of time. Subsequent to the completion of the examination by respondent's agents, an attorney-accountant, in the employ of counsel for the petitioners herein, spent approximately a year examining the affairs of Dr. Johnson in connection with report made by the agents of their investigation of his tax liability. In addition, the attorney-accountant spent a considerable amount of time examining the affairs of Scott-Nickels and Henry Nickels in connection with the reports of the agents of their investigation of the tax liability of those taxpayers. As a result of the foregoing extensive investigations and examinations, the parties have made a record herein consisting of several thousand pages of stipulated, oral and other evidence. The task of determining the numerous and varied questions presented in the light of such a record was a difficult one. However, our findings, conclusions, and holdings herein represent our best judgment on all those questions after a consideration of all the evidence presented. Decisions will be entered *253 under Rule 50. Footnotes
*. Victory tax net income.↩
*. Victory tax net income.↩